IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KIMBERLY C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV231 |
| | ) | |
| FRANK BISIGNANO,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kimberly C. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on August 26, 2021, and later an application for SSI, alleging a disability onset date of December 1, 2017 in both applications.

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(Tr. at 17, 266-67, 282-87.)[2] Her applications were denied initially (Tr. at 78-107, 156-65) and upon reconsideration (Tr. at 108-37, 167-75). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 177.) On August 30, 2023, Plaintiff, along with her attorney, attended the subsequent telephone hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 17, 38-77.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 31), and on January 29, 2025, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992)

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

(quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ determined that Plaintiff engaged in "substantial gainful activity" since December 1, 2017, her alleged onset date.[5] Specifically, the ALJ found that Plaintiff's "work through January 31, 2018 constituted substantial gainful activity." (Tr. at 19.) However, the ALJ further determined that Plaintiff's "work since then has not risen to the level of substantial gainful activity," and she therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process after that date. (Tr. at 19.)

---

"ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

[5] Notably, Plaintiff's was last insured for purposes of DIB on June 30, 2023. Thus, the relevant period for her DIB claim extends from December 1, 2017 to June 30, 2023. In contrast, the period at issue for purposes of SSI runs from the date of her Application, September 7, 2021, through the date of the ALJ's decision, January 30, 2024.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments:

> seizure disorder, migraines, asthma, obesity, fibromyalgia, depression, anxiety, posttraumatic stress disorder, and alcohol use disorder[.]

(Tr. at 20.) The ALJ determined at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 20-22.) Therefore, the ALJ assessed Plaintiff's RFC and concluded that she could perform light work, but with the following, non-exertional limitations:

> [Plaintiff can] sit for 6 hours in an 8-hour workday; stand and walk for 4 hours in an 8-hour workday; occasionally climb ladders, ropes, and scaffolds; have occasional exposure to dusts, fumes, odors, gases, and poor ventilation; and have no exposure to hazardous machinery and unprotected height[s]. [Plaintiff] is limited to understanding, remembering, and carrying out simple instructions; can use judgment to make simple work-related decisions; and can sustain concentration, attention, and pace sufficient to carry out simple, routine, repetitive tasks for two-hour intervals over the course of an 8-hour work day. She is limited to work in occupations that require no more than occasional contact with co-workers and supervisors and no contact with the general public as an essential function of the job. [Plaintiff] is limited to work in a low stress setting, which is defined to mean work involving: no paced production requirements, such as on an assembly line, where the worker does not control the pace of production, occasional changes in the work setting or routine, and no dealing with crisis situations as an essential function of the job.

(Tr. at 22.) At step four of the analysis, the ALJ determined, based on the testimony of the vocational expert, that all of Plaintiff's past relevant work exceeded the above RFC. (Tr. at 29.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those

factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 29-30.)

Plaintiff now raises four challenges to the RFC assessment. Specifically, Plaintiff contends that the RFC does not adequately account for (1) her fibromyalgia symptoms, (2) her need for an emotional support animal, (3) her headaches symptoms, or (4) her need to miss work to attend medical appointments. After a thorough review of the record, the Court considers Plaintiff's first, third, and fourth contentions together and finds that the ALJ failed to consider the combined effect of Plaintiff's symptoms and treatment on her ability to maintain a work schedule.

Although Plaintiff parses the issues in her brief into separate arguments, a holistic reading reveals that she primarily challenges the ALJ's failure to adequately consider potential absences caused by Plaintiff's migraine headaches, fibromyalgia, and medical appointments. At the hearing, Plaintiff testified that she has good days and bad days, and the primary issues with maintaining employment are her need to "call out" on bad days and her inability to work full days or more than one day in a row. (Tr. at 52, 59, 61, 62-63; see also Tr. at 326.) Regarding headaches, the ALJ recounted Plaintiff's testimony that she has been on different medications for migraines, including monthly injections of Emgality, but that "[t]hey still happen once or twice a week." (Tr. at 23, 61.) When Plaintiff experiences a migraine, "[i]t feels like the room is spinning, she cannot tolerate lights, and she is nauseous. They can last an[] hour or sometimes all day." (Tr. at 23, 61.) In 2021, despite several medical changes, Plaintiff reported to her neurologist that she continued to experience "about 3 migraines per month." (Tr. at 24.) Records from March 2022 likewise reflect that she continued to have 3 migraines per

month, even with medication. (Tr. at 1369.) A year later, in June 2023, Plaintiff reported that her headaches remained the same. (Tr. at 2173.) Specifically, she described migraines occurring two to three times a month in addition to "a major headache once a week, typically triggered by stress." (Tr. at 2173.) The ALJ discounted the impact of these headaches, noting that Plaintiff remained able to care for herself, her child, and her household, as well as work part time in a public-facing job. (Tr. at 25.) "Nevertheless," noted the ALJ, "given [Plaintiff's] mental impairments, as well as her migraines, it is reasonable to limit her to understanding, remembering, and carrying out simple instructions" as well as simple, work-related decisions, low-stress work, and limited social interactions. (Tr at 25.) Similarly, the ALJ found that, "[b]ased on the evidence of seizures or pseudoseizures, as well as migraines, it is reasonable to impose hazard and stress restrictions." (Tr. at 26.)

Notably, the ALJ failed to include any RFC limitations regarding absences or time off-task. As Plaintiff correctly notes, the vocational expert testified that "being off task 15% of the time would be work preclusive," as would "having any more than one unscheduled absence a month." (Tr. at 72.) In an unpublished opinion, the Fourth Circuit held that such testimony, when unaddressed by the ALJ, may require demand. See Woody v. Kijakazi, No. 22-1437, 2023 WL 5745359, at *1 (4th Cir. Sept. 6, 2023) (holding that "the ALJ erred by not making specific findings regarding how often [the plaintiff] would be absent from work due to the frequency and severity of her headaches" where the "vocational expert testified a hypothetical person would be precluded from maintaining full time employment if she were absent more than once a month" and the record showed that, "even after receiving treatment that reduced

the frequency of her headaches, [the plaintiff] still reported getting headaches about once a week.").

In the present case, Plaintiff testified that some of her headaches "can last all day." (Tr. at 61.) Moreover, as set out above, Plaintiff also regularly reported to her providers that she continued to have migraines and/or other major headaches "at least once or twice a week." (See Tr. at 23, 61, 1369, 2173, 2174.) Although some more recent records, including those cited by the ALJ, demonstrate that Plaintiff reported improvement in headache frequency and symptoms since starting Emgality injections, reducing her reported headaches to three or four a month during 2022 and 2023 (see, e.g., Tr. at 24, 2163-65, 2173-74), this number of headaches still potentially exceeds the one absence a month allowed for competitive, unskilled work.

The ALJ's failure to sufficiently consider and address this possibility is compounded by her related failures to address Plaintiff's absences due to (1) fibromyalgia symptoms and (2) medical appointments. As recounted in the ALJ's decision, Plaintiff testified as follows:

> She is currently working at Safari Nation at the front desk. Her employer accommodates her by giving her a chair so that she does not have to stand. She started the job in February 2023 and works 15 to 18 hours per week. Her biggest problems are her fibromyalgia and seizures. She was diagnosed with fibromyalgia in college. She has had chiropractic treatment and physical therapy. She also takes medication prescribed to her by her primary care provider and a pain clinic. Both medications are for fibromyalgia. She has good and bad days. At first the medication helped a little[,] but the past few months, she has not been able to get out of bed. Physical therapy seemed to help over that time. They gave her home exercises. She started physical therapy about a year ago. Her fibromyalgia makes it so that some days she cannot get out of bed. Other days, she cannot walk a few minutes. She calls out of work most days. She almost lost her job because of it. Each day is different. . . . The pain from fibromyalgia is in [her] back. It is constant and stays at a pain level of 7 or 8. She uses a back brace once or twice a week. Sitting, standing, and walking make[ ] the pain worse. She can sit for about 45 minutes before needing to get

> up and stretch and move around. She would need to move around for a few minutes and then she can sit back down.

(Tr. at 23.)

The ALJ ultimately minimized Plaintiff's statements regarding the limiting effects of her fibromyalgia, noting that they were not supported by the evidence of record. Nevertheless, the ALJ acknowledged that Plaintiff attended pain management and continued to experience pain due to her fibromyalgia which caused limitation beyond those opined by the State agency consultants. In light of this pain, the ALJ limited Plaintiff to light, rather than medium, work, reduced her ability to stand and walk to four hours, rather than six, and included extensive additional postural and mental limitations. (Tr. at 22, 26.) The ALJ did not, however, meaningfully address why she dismissed evidence that fibromyalgia flares would cause Plaintiff to miss work. Notably, the July 2023 letter from Plaintiff's employer, Lilly Merga, supports Plaintiff's testimony on this point. As recounted by the ALJ, "Ms. Merga reported [that Plaintiff] was an exemplary employee and was quickly promoted but is not dependable as she calls out sick when she cannot get out of bed and noted [that Plaintiff] comes to work using a cane and in 'obvious' pain." (Tr. at 28) (citing Tr. at 376). Ms. Merga explained that:

> [Plaintiff] has been working at our Greensboro location since February of 2023. She was initially hired as a staff member, but she was quickly promoted to an opener and closer. She is an exemplary staff member at our company.
>
> Unlike our normal openers and closers, I don't schedule [Plaintiff] by herself because if/when she gets sick, she can't get out of bed, so she is forced to call out. This has put me in a predicament before, so I was forced to schedule her with someone else.
>
> As I stated above, I schedule an extra person with her just to be safe. I have noticed that if I schedule [Plaintiff] for 3 days in a row, with 4 hours each day, she would likely call out the 4th day. If she doesn't call out, she would come to work using her cane and it is obvious that she is in pain.

> We made some accommodations for her by placing a chair at the register. We are now making accommodations to the schedule, by scheduling her with a day or two off in between her work days. As this helps her rest before another shift.
>
> We do not make her do the normal opening or closing duties besides counting the register, as it hurts her doing any type of strenuous activity.
>
> We have been very short staffed but I cannot work her more than 15+ hours a week due to the amount of pain/strain it puts on her. It does put us in a very difficult place. When she is able [to work] she does an amazing job. I just wish we could have her work more.

(Tr. at 376-77.)

The ALJ dismissed the need for greater limitations outlined in Ms. Merga's letter, noting that the letter "does not support greater mental limitations" and "[w]hile it may suggest greater physical limitations, those greater limitations are not supported by the record evidence, as discussed herein." (Tr. at 28.) However, it is not clear how "the record evidence" fails to support Plaintiff's testimony and Ms. Merga's letter on the need for reduced hours, rest days, and unexpected absences. Plaintiff's medical records, including counseling records and physical therapy records for the six months from her starting part-time work in February 2023 to the hearing in August 2023, reflect these same concerns. Specifically, the medical records reflect that Plaintiff's headaches and fibromyalgia improved some with medication beginning in March 2022, and a few months later she reported that she was considering looking for a part-time job since things were going better. (Tr. at 1485, 1439, 1467, 1504, 1648, 1649, 1650, 1652, 1654, 2173–74.) However, she still continued to experience headaches and fibromyalgia-related pain. (Tr. at 2107, 1516, 1522, 1528, 1534, 1710, 1738, 1745, 1868, 1850, 2101.) She interviewed for her part-time position in January 2023 and started in February 2023. Notably, the records reflect periods of crying from pain at her job (Tr. at 1675, 1676), calling out of

work due to pain (Tr. at 1809, 1688, 1692, 1695, 1717), significant pain requiring a rest day after working an 8-hour shift (Tr. at 1816), flares of back pain after working over the weekend even if sitting (Tr. at 1823), adjustments to her work schedule for shorter shifts spread through the week to accommodate her pain (Tr. at 1801), significant ongoing fibromyalgia pain in her back (Tr. at 1794, 1752, 1759, 1766), pain flares after trying to work four days in a row (Tr. at 1704), and the owners at her job working around her schedule due to her pain (Tr. at 1680, 1685, 1690, 1691, 1692, 1697).

Thus, it is not clear how these limitations are "not supported by the record evidence, as discussed herein." (Tr. at 28.) In the briefing, Defendant notes that the ALJ "appropriately relied on Plaintiff's relatively effective treatment regimen." (Def.'s Br. [Doc. #9] at 8.) However, while the records certainly reflect some improvement over time, there are several years of almost daily headaches or headaches at least three times per week earlier in the relevant period in 2018, 2019, and 2020, (Tr. at 700, 707, 714, 408, 722, 739, 901). Moreover, even after there was some improvement, the ALJ acknowledged that she was still experiencing three migraines per month and several seizures per week, with ongoing pain management (Tr. at 24), and the records reflect continued fatigue and flares after attempting to work as well as unexpected absences, as outlined above, which the ALJ did not address. Defendant also cites to the ALJ's reliance on Plaintiff's daily activities, including part-time work, without addressing the evidence of her limitations in those activities, particularly the evidence of her need for shorter shifts, rest days, and unexpected absences noted above, and the evidence throughout the record of relationship issues with her boyfriend because all of the household tasks fell on him due to Plaintiff's pain and limitations. (Tr. at 1287, 1095). In Woods v. Berryhill, the

Fourth Circuit explained that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); see also Arakas v. Comm's of Soc. Sec., 983 F.3d 83, 100 (4th Cir. 2020) ("Even assuming, as the ALJ noted, that Arakas's daily activities have, at least at times, been somewhat greater than [she] ... generally reported, he provided no explanation as to how those particular activities ... showed that [s]he could persist through an eight-hour workday.") (internal citations omitted); Lewis v. Berryhill, 858 F.3d 858, 868, n.3 (4th Cir. 2017) ("The ALJ points to Lewis' ability to perform incremental activities interrupted by periods of rest, such as 'driv[ing] short distances of up to 30 miles, shop for groceries with the assistance of her mother or roommate, handle her finances, and watch television.' The ALJ's conclusion that Lewis' activities demonstrate she is capable of work is unsupported by the record.") (citation omitted); Brown v. Comm'r, 873 F.3d 251, 263 (4th Cir. 2017) ("[T]he ALJ noted that Brown testified to daily activities of living that included 'cooking, driving, doing laundry, collecting coins, attending church and shopping.' The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday."); see also Fletcher v. Colvin, No. 1:14CV380, 2015 WL 4506699 at *5-8 (M.D.N.C. Jul. 23, 2015).

Finally, Defendants note that the ALJ relied on the examination by PA Seitz, which reflected no observed functional limitations, and the normal examinations in the record. (Def.'s Br. at 8-10; see Tr. at 25, 27.) However, as noted by Plaintiff, in Arakas, the Fourth Circuit explained that some conditions, such as fibromyalgia, simply do not manifest themselves in objective signs and symptoms. Arakas, 983 F.3d at 97. As noted in Arakas, "[a] growing number of circuits have recognized fibromyalgia's unique nature and have accordingly held that ALJs may not discredit a claimant's subjective complaints regarding fibromyalgia symptoms based on a lack of objective evidence substantiating them." Id. The Fourth Circuit "join[ed] those circuits" and held that:

> ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence. Objective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease. If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence substantiating the claimant's impairment. We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.

Id. at 97-98.

More recently, the Court of Appeals for the Fourth Circuit decided Hultz v. Bisignano, 162 F.4th 111, 115 (4th Cir. 2025), which reiterated that "[i]n Arakas, this Circuit held that ALJs may not rely on objective medical evidence even as just one of multiple factors to discount a claimant's subjective complaints regarding symptoms of fibromyalgia. [. . .] [F]ibromyalgia is a serious and mysterious condition, disproportionately affecting women, that our current science is incapable of observing through objective medical testing." Hultz v.

Bisignano, 162 F.4th 111, 115 (4th Cir. 2025). The Hultz court "reiterated that claimants are 'entitled to rely exclusively on subjective evidence to prove that [their] symptoms were so continuous and/or severe that they prevented [the claimant] from working a full eight-hour day.'" Hultz, 162 F.4th at 121 (citing Arakas, 983 F.3d at 96) (cleaned up).

> We found that the ALJ in Arakas failed to adhere to this standard when he required that her subjective descriptions of her symptoms to be supported by objective medical evidence. Arakas, 983 F.3d at 96. We noted that this "type of legal error is particularly pronounced in a case involving fibromyalgia—a disease whose symptoms are entirely subjective." Id. (cleaned up). As both Arakas's rheumatologist and other circuit courts have observed, physical examinations of fibromyalgia patients did not produce clinical and laboratory abnormalities, and usually yielded a full range of motion, no joint swelling, and normal muscle strength and neurological reactions. Id. Accordingly, we held that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." Id. at 97.

Id. Notably, in Hultz, the Fourth Circuit found that "when discounting Ms. Hultz and her grandmother's testimony under the step four RFC analysis, the ALJ stated—in language that is nearly identical to the reversed ALJ decision in Arakas—that the ALJ did so because 'the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.' This is in clear contravention of Arakas." Id. at 122. In the present case, the ALJ likewise reviewed Plaintiff's symptoms but held that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 23.) This is the same language

that the Fourth Circuit in Hultz found was "in clear contravention of Arakas." Hultz, 162 F.4th at 122.[6]

As explained in another case from this District, Arakas explains that fibromyalgia is a "'unique' disease with symptoms [that] are entirely subjective." Cowan v. Kijakazi, No. 1:21CV196, 2022 WL 3446078, at *8 (M.D.N.C. Aug. 17, 2022), report and recommendation adopted, No. 1:21CV196, 2022 WL 17831951 (M.D.N.C. Sept. 21, 2022) (quoting Arakas, 983 F.3d at 97.) In Cowan, the Court specifically considered a situation where, as here, the ALJ analyzed the plaintiff's fibromyalgia together with other impairments and "in doing so, relied on objective medical evidence to discount a Plaintiff's subjective symptom reporting," and in that scenario "the Court "c[ould] not rule out the possibility that the ALJ impermissibly relied on objective evidence, even as just one factor, in discounting the intensity, persistence, and limiting effects of [her] subjective complaints of fibromyalgia pain and fatigue in violation of Arakas." Cowan, 2022 WL 3446078 at *8; see also Crystal H. v. O'Malley, No. 1:23CV733, 2024 WL 3677338 at *7 (M.D.N.C. Aug. 6, 2024) (collecting cases).

Here, the ALJ (1) improperly relied on a lack of objective evidence in discounting Plaintiff's fibromyalgia symptoms in contravention of Arakas and Hultz; (2) improperly relied on Plaintiff's activities of daily living without considering the extent of her ability to do those activities and her limitations in those activities reflected in the record, in contravention of

---

[6] In Hultz, the Fourth Circuit also considered the ALJ's analysis of the other factors, and found that:

> The ALJ discounted [the plaintiff's and her grandmother's testimony] without adequate explanation. And this Court cannot identify evidence in the record that contradicts Ms. Hultz's testimony about her conditions. Her off-and-on treatment and taking of medications, her occasional ability to engage in daily activity, and even her marked improvement on her other medical issues all remain consistent with debilitating fibromyalgia symptoms.

Hultz, 162 F.4th at 124.

Woods and Arakas, and (3) most notably here, failed to address Plaintiff's need for short shifts, rest days, and unexpected absences, or explain how those limitations, reflected in her testimony, her employer's letter, and her medical records, was "not supported by the record evidence." (Tr. at 28.)[7] As set out above, the RFC measures a claimant's ability to do sustained work-related physical and mental activities in a work setting "on a regular and continuing basis," 20 C.F.R. §§ 404.1545(b) and (c) (emphasis added). This "'means 8 hours a day, for 5 days a week, or an equivalent work schedule,'" Hines, 453 F.3d at 562 (emphasis omitted) (quoting Social Security Ruling 96-8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (July 2, 1996) ("SSR 96-8p")). As previously noted, the vocational expert in the present case testified that "an individual who had more than one unscheduled absence a month would be unable to sustain employment." (Pl.'s Br. [Doc. #8] at 22) (citing Tr. at 72). Because the ALJ did not address Plaintiff's primary contention, which is the combined impact of Plaintiff's impairments and treatment on her ability to attend work regularly, including her ongoing unscheduled absences due to fibromyalgia flares, muscle seizures, and headaches, and her need for reduced hours and rest days due to fibromyalgia-related fatigue, the Court cannot follow the ALJ's reasoning, rendering the decision unsupported by substantial evidence. See Woods, 888 F.3d at 694 (holding that an ALJ must "both identify evidence that supports his conclusion and build an

[7] The ALJ also implied that Ms. Merga's statements were of limited value because she and Plaintiff had become friends outside of work. (Tr. at 28.) However, it is not clear if the ALJ therefore concluded that Ms. Merga was being untruthful in her assessment as Plaintiff's boss, or how the ALJ then analyzed whether Plaintiff would have any unexpected absences or any need for rest days or shorter shifts.

accurate and logical bridge from that evidence to his conclusion." (internal brackets, emphases, and quotation omitted)). Accordingly, this matter requires remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). To this extent, it is further RECOMMENDED that Defendant's Dispositive Brief [Doc. #9] be DENIED, and Plaintiff's Dispositive Brief [Doc. #8] be GRANTED to the extent set forth herein.

This, the 31st day of August, 2026.

Joi Elizabeth Peake
United States Magistrate Judge